**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GIRALDES,<br><br>    Petitioner,<br><br>  v.<br><br>ANA RAMIREZ-PALMER, warden,<br><br>    Respondent.<br>_____ / | No. C 98-2757 (pr)<br><br>**ORDER DENYING MOTION FOR RECONSIDERATION** |

### INTRODUCTION

Larry Giraldes now moves for reconsideration in this long-closed action for writ of habeas corpus. He asks the court to reconsider and set aside the 1998 order dismissing this action as untimely because he has new evidence showing his actual innocence of the two murders. However, his evidence is neither new nor proof of his actual innocence. His motion for reconsideration is simply the latest presentation of the same basic evidence he has been presenting to courts since 1997 – namely, that two other persons present at the killings were convicted of perjury based on their testimony at Giraldes' trial and also were convicted of homicide crimes based on the same killings that led to Giraldes' first degree murder convictions. The court denies the motion for reconsideration because it was not filed within a reasonable time and does not show actual innocence because the other parties' convictions are not incompatible with Giraldes' murder convictions that were based on the theories that the killings were the natural and probable consequences of the drug distribution conspiracy committed by co-members in furtherance thereof or that he aided and abetted the killings.

**BACKGROUND**

Giraldes was convicted in the Santa Clara County Superior Court of two counts of first degree murder, burglary, illegal possession of a gun by a felon, and conspiracy to escape by force and violence. On March 9, 1993, he was sentenced to two consecutive terms of 25 years to life and to a determinate term of twelve years and four months in prison. His actual innocence argument is limited to the two murder convictions.

A.   State Court Criminal Case

The California Court of Appeal described the evidence in the case against Giraldes and his co-defendant, Willie Shackelford. The lengthy description is repeated here because the crimes were committed in connection with an ongoing drug business and because many of the details in that lengthy description undermine Giraldes' actual innocence argument. Giraldes urged at trial and urges here that, although he was present at the killings, he did not take part in the killings and was surprised when the Grasso brothers shot and killed the victims. The state appellate court paints a far different picture, as it describes testimony from several sources about statements by Giraldes before and after the killings indicating his intent, planning and involvement in the killings; and testimony that Shackelford (who also was present at the killings) had told an associate that Giraldes personally shot at one of the victims before the Grasso brothers killed the victims.

The evidence presented at trial was summarized by the California Court of Appeal:

> On October 13, 1991, at approximately 7:35 p.m., San Jose police, responding to reports of gunshots, proceeded to the area of the Alum Rock Park in San Jose. Arriving at the scene, the police found the bodies of victims Fry and Jouron. Both victims were seated in a Ford pickup truck belonging to Fry. Fry was in the driver's seat and Jouron was in the passenger's seat. A .12 gauge shotgun blast had torn away Fry's neck. A .45 calibre bullet had entered the top of Jouron's head and exited near his right ear. Another .45 calibre bullet had struck the left side of Jouron's neck. A nine millimeter bullet had hit Fry near the left ear. Another nine millimeter bullet had hit Jouron in the hip.
>
> At the time of the homicides, Guillermo Chavez (hereafter, Guillermo or Chavez) headed a drug ring that sold high grade cocaine. Chavez's front was the Chavez Auto Body, an auto repair shop operated by his older brother Robert Chavez. The victims, Fry and Jouron, were Chavez's employees. The victims distributed cocaine and collected drug debts for Chavez.

2

One of Chavez's drug dealers was Giraldes. Giraldes lived in an apartment in Sunnyvale with the brothers Rosario and Michael Grasso.

Shackelford was Giraldes's "runner." Shackelford was legitimately employed at Empire Auto Sales, a used car dealership partly owned by Kourosh Saghafian. Shackelford's main duty at the dealership was to clean and park cars.

Saghafian was one of Giraldes's customers. Saghafian normally got his cocaine directly from Giraldes. On one or two occasions, however, Shackelford delivered Giraldes's cocaine to Saghafian.

Tension developed between Chavez and the victims. In September 1991, the victims approached Chavez for a loan of $10,000 to start their own methamphetamine business. Chavez refused the loan request. Chavez's refusal angered the victims.

When the victims could not deliver to Chavez all the drug money owed by the customers, this would anger Chavez. Chavez would argue with the victims that they were "fronting" [footnote omitted] too much cocaine to the Grasso brothers who were not paying fast enough.

Chavez suspected that the victims were cheating on him. Chavez had boasted that his cocaine was "as pure as he can get," and that he was selling it just as pure. He told everyone he did not want anyone diluting his cocaine. Chavez considered anyone diluting the cocaine he sold to his customers as stealing from him.

When Chavez received complaints from his customers that the cocaine delivered by the victims was diluted, Chavez confronted the victims. The victims denied diluting Chavez's cocaine.

Friction likewise developed between the victims and Giraldes and Shackelford. Giraldes did not like the victims because they came around too often, interfered too much, and made threats. Giraldes believed that the victims were going to "rip off" Chavez and take over Chavez's cocaine business. Giraldes wanted to show to Chavez that the victims were "doing [Chavez] wrong."

Giraldes told Saghafian that the victims had threatened him and that he wanted to get rid of them. Giraldes also told Saghafian that he would "move up one step" in the drug operation and would cut out the middle man.

Robert Lindsey owned a collection of some 200 guns. In October 1991, Lindsey's collection was burglarized. Two of the missing guns were subsequently found in the possession of Julio Santos. Santos, a felon, was arrested, charged, and convicted for his possession of those firearms, and served a prison sentence.

After Santos was granted immunity, he testified that on October 10, 1991, he was offered money by Jouron to help Giraldes, the Grasso brothers, and an unidentified man remove a heavy box from a certain residence and load it into a black Camaro driven by Giraldes.

The box was taken to John DeRose's residence where it was opened. Gina Garcia testified that the box contained many guns. Jouron let Santos pick some guns as payment for Santos's part in the burglary.

A day or two before the homicides, Chavez received a telephone call at his auto shop. After Chavez had hung up, he told his brother Robert Chavez and Robert Lopez that the

3

victims were setting him up for four kilos, and were planning to kill him. Chavez said he was going to "get those mother fuckers and kill them."

Two hours later, Giraldes arrived at the shop. Giraldes told the Chavez brothers that the victims were plotting to take away Chavez's cocaine in a set-up. Robert Chavez told his brother Guillermo: "Well, they're your friends, you brought them in, you take them out, you get rid of them." Chavez said he was going to get the victims before they got him. Giraldes told Chavez he knew the victims were "gonna do that to you."

Saghafian testified that Giraldes had told him in a telephone conversation that Jouron was coming over that night and that he, Giraldes, was going to put mercury in Jouron's drink.

Garcia testified that she had overheard Giraldes say on the phone that "we have to get rid of these guys for [Chavez]."

Lopez testified that on Saturday evening (Oct. 12), the victims delivered to Chavez at the Chavez auto shop most of the guns from the Lindsey burglary that Chavez had bought. Jouron wanted to keep one of the automatic firearms (the Uzi), but Chavez did not want any of the guns to go to the victims because Chavez did not trust them.

Lopez testified that when the victims brought the guns to Chavez, Jouron asked Chavez if he was going with them to the hills to test the gun. Chavez responded that he was going and would meet them there. Chavez told the victims that the Grasso brothers and Giraldes would also be there. Later, Chavez said that "he was going with his girlfriend somewhere" and "might not be able to make it." Chavez gave the victims some cocaine for their own use, telling them to "have a good time."

Carlos Pereira was at the house of James Harmon on Sunday, October 13, 1991. Pereira testified that Giraldes and Shackelford showed up at Harmon's residence during the day. Giraldes and Shackelford walked into the back room and packed the guns that were in the room's closet. Giraldes and Shackelford "were wrapping [the guns] in a blanket and taking then to the car." Pereira heard Giraldes "talking about that we should get him in Sun Crest and then we can hit 680 to 237 to 101."

Delores Harmon testified that Giraldes had told her that he was taking all the guns from the Harmon residence because he did not want the Harmons to get involved. Shackelford and the Grasso brothers carried the guns from the Harmon's back room to Giraldes's car. Giraldes removed Lindsey's .12 gauge shotgun from his car and handed it to Mike Grasso.

Pereira and Steve Nelson heard Giraldes say that Giraldes had "put something in somebody's drink, and that if it worked, they wouldn't have to do it today."

On Monday, October 14, 1991, at 5:30 a.m., defendants and Rosario Grasso went to DeRose's residence. Present in DeRose's home at that time were DeRose, Garcia, and Jackie Pintacura. Garcia testified that defendants had told DeRose and the other persons in DeRose's home that they, the defendants, had "just killed" the victims. Giraldes said they killed the victims because it was "better them than us." Shackelford said he drove the white Mustang, Rosario Grasso used one gun, and Michael Grasso used the other gun. Rosario Grasso said he blew Jouron's head off. Garcia testified that Rosario Grasso brought the Uzi rifle to DeRose's residence, "took it apart," and cleaned it.

Shackelford told Garcia that he drove the getaway car. Shackelford had also said: "I didn't—I wasn't any part of it; I didn't pull the trigger." At the DeRose apartment,

4

> Shackelford told the people present that if anyone said anything, "he was going to shoot us."
>
> Shackelford returned the white Mustang to Saghafian the following Monday morning. Saghafian was angry with Shackelford because he had not returned the car to the dealership lot on Sunday, did not call Saghafian when he (Saghafian) paged him, and because the car had been involved. Shackelford said the Mustang was not involved in the killings because the car that was used was the black Camaro. Shackelford explained that the white Mustang was switched with the Camaro after the killings, and was used only as the getaway car.
>
> Shackelford narrated to Saghafian the details of the killings. Shackelford said Michael Grasso had shot Fry in the head with a shotgun and Fry was the first one killed for Jouron to see what it was like; and Rosario Grasso killed Jouron.
>
> Defense Evidence
>
> Giraldes testified in his defense; Shackelford did not. Giraldes testified that he witnessed the murders. He said he saw the Grasso brothers shoot the victims. He said he did not know what to do because "everybody had guns, everybody was running around with a gun." He said he decided it was "best to get out of there as quickly as possible." He said he got into the Mustang that was driven by Shackelford, and the two of them then left.

California Court of Appeal Opinion (Docket # 4, Ex. 2) at 1-7.  The morning after the killings, Shackelford had told Saghafian "that the Grasso brothers had shot Fry and Jouron, that Giraldes had fired the Uzi into Jouron's lap, and that he had driven the Mustang as the getaway car." *Id.* at 44.


B.     The Grasso Brothers

The California Court of Appeal's opinion in the appeal filed by Giraldes and Shackelford did not devote much time to the role of Michael and Rosario Grasso in the prosecution of Giraldes and Shackelford.  The Grasso brothers had, however, provided evidence used in the prosecution of Giraldes and Shackelford:

> Sometime after the killings, Rosario and Michael contacted the police and stated that they were witnesses to the killings and that they wanted to provide information to the police. Rosario and Michael testified at the joint preliminary hearing that they, as innocent bystanders, witnessed Giraldes, Shackelford and an unidentified Hispanic man shoot the victims. Giraldes and Shackelford were charged with the murders of Jouron and Fry. The Grasso brothers were called as witnesses at the Giraldes and Shackelford trial and gave testimony similar to the testimony they gave at the preliminary hearing. Thereafter, the police continued investigating the "Chavez drug ring" in connection with the murders. To this end, the police questioned Michael on December 23, 1993. During this interview, Michael confessed that he and Rosario fabricated the story about the unidentified

5

1  Hispanic man, and that they both had participated in the killing of Jouron and Fry.
2  *Grasso v. Yearwood*, No. C 99-1407 SI, 2000 WL 502849, *1 (N. D. Cal. Apr. 17, 2000).

3  The Grasso brothers were charged with murder and several counts of perjury, and eventually were jointly charged with Chavez, who was prosecuted as the mastermind of the murders. *See id.* Rosario Grasso was convicted of two counts of second degree murder, eight counts of perjury, and one count of possession of stolen property. Michael Grasso was convicted of one count of involuntary manslaughter, eight counts of perjury, and one count of possession of stolen property. The statements that were the subject of the perjury counts in the March 7, 1994 indictment against the Grasso brothers concerned Shackelford and the Hispanic man but did not mention Giraldes.[1] The Grasso brothers were sentenced in October 1995 to prison terms shorter than the term Giraldes received, i.e., Rosario was sentenced to 34 years and 8 months to life, and Michael was sentenced to 11 years and 8 months. *See* Docket # 4 at Ex. 8.

C.   A Brief History Of Giraldes' Collateral Challenges Based On The Grasso Brothers

After his appeal failed, Giraldes filed a petition for writ of habeas corpus in the Santa Clara County Superior Court in 1997. That petition asserted that Giraldes was "factually innocent" of the murders and argued that the Grasso brothers' convictions demonstrated them to be the killers. *See* Docket # 4 at Ex. 5; *see id.* at 13 ("The conviction of the Grasso brothers

---

[1] The perjury counts in the March 7, 1994 indictment were for specific statements made in June 1992 at the preliminary hearing and in December 1992 at the trial. Both Grasso brothers were charged with perjury for several specific statements. Counts 3 and 4 were based on Michael Grasso's testimony "that Willie Shackelford held and/or used a long gun like a rifle or shotgun on October 13, 1991, at Alum Rock Park in the shooting deaths of Alex Fry and Peter Jouron, when in fact defendant Michael Richard Grasso used the shotgun in the shooting deaths of victims Alex Fry and Peter Jouron." Resp. Motion To Dismiss, Ex. 8 (March 7, 1994 indictment) at 4-5. Counts 5 and 6 were based on Michael Grasso's testimony "that an unidentified Hispanic male used a large revolver during the shooting deaths . . . when in fact Rosario Bruce Grasso used the large revolver during the shooting deaths." *Id.* at 5-6. Counts 7 and 8 were based on Rosario Grasso's testimony "that Willie Shackelford held and/or used a long gun like a rifle or shotgun . . . in the shooting deaths . . . when in fact defendant Michael Richard Grasso used the shotgun in the shooting deaths." *Id.* at 7-8. Counts 9 and 10 were based on Rosario Grasso's testimony that "an unidentified Hispanic male used a large revolver during the shooting deaths . . . when in fact Rosario Bruce Grasso used the large revolver during the shooting deaths." *Id.* at 8-9.

1  after Giraldes' appeal became final is 'newly discovered evidence' which goes to the heart of
2  Giraldes' innocence."). The superior court rejected his petition in a reasoned decision dated July
3  21, 1997. *See* Docket # 4 at Ex. 6.

4  Giraldes filed this action for a writ of habeas corpus in July 1998. In his petition, he
5  argued that the Grasso brothers' convictions showed that his conviction had been obtained with
6  the use of perjured testimony. He did not argue actual innocence. The court dismissed the
7  petition as barred by the statute of limitations in a November 3, 1998 order. Giraldes did not
8  appeal from the dismissal.

9  Giraldes tried to file a second federal petition for writ of habeas corpus in September
10 2008. In that petition, he argued that the Grasso brothers' convictions amounted to new evidence
11 of his actual innocence. *See Giraldes v. Adams*, N. D. Cal. No. 08-4439 SI at Docket # 1 at 6-7.
12 The court dismissed the petition as a second/successive petition for which Giraldes had not first
13 received permission to file from the Ninth Circuit.

14 Giraldes then applied to the Ninth Circuit in 2009 for permission to file a second or
15 successive permission, and once again argued that the Grasso brothers' convictions were newly
16 discovered evidence. The Ninth Circuit rejected his application on April 29, 2009. *See In Re.*
17 *Giraldes*, Ninth Cir. No. 09-70514.

## DISCUSSION

A.   Rule 60(b) Motion For Reconsideration

   1.   Legal Standards

Federal Rule of Civil Procedure 60(b) lists six grounds for relief from a judgment. Such a motion must be made within a "reasonable time," and as to grounds for relief (1) - (3), no later than one year after the judgment was entered. *See* Fed. R. Civ. P. 60(c). Rule 60(b) provides for relief where one or more of the following is shown: (1) mistake, inadvertence, surprise or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered before the court's decision; (3) fraud, misrepresentation or misconduct by the adverse

1  party; (4) the judgment is void; (5) the judgment has been satisfied, is based on a vacated
2  judgment, or its prospective application is no longer equitable; (6) any other reason justifying
3  relief.  Fed. R. Civ. P. 60(b).

4  Subsections (1), (2), and (3) are not available because Giraldes' 2014 motion was not
5  made within one year of the entry of judgment in 1998.  Subsection (4) does not fit because the
6  judgment is not void.  That leaves only subsections (5) and (6) as possibilities for Giraldes.

7  Rule 60(b)(5) permits relief from a judgment when "it is based on an earlier judgment that
8  has been reversed or vacated; or applying it prospectively is no longer equitable."   This rule
9  "may not be used to challenge the legal conclusions on which a prior judgment or order rests,
10 but the Rule provides a means by which a party can ask a court to modify or vacate a judgment
11 or order if 'a significant change either in factual conditions or in law' renders continued
12 enforcement 'detrimental to the public interest.'" *Horne v. Flores*, 557 U.S. 433, 447 (2009)
13 (citation omitted).  This rule serves "a particularly important function" in "institutional reform
14 litigation." *Id.*  Rule 60(b)(5) does not appear to fit the present situation of a dismissal of habeas
15 petition because that judgment, unlike a consent decree or injunction or conditional grant of the
16 writ, does not have a prospective application.  *Cf. Harvest v. Castro*, 531 F.3d 737 (9th Cir.
17 2008) (order conditionally *granting* the writ could be the subject of Rule 60(b)(5)).

18 The only subsection under which Giraldes might proceed is Rule 60(b)(6), which allows
19 relief from a judgment for "any other reason that justifies relief."  This "catchall provision"
20 applies only when the reason for granting relief is not covered by any of the other reasons set
21 forth in Rule 60.  *See Jones v. Ryan*, 733 F.3d 825, 839 (9th Cir. 2013).  The movant "must show
22 'extraordinary circumstances' justifying the reopening of a final judgment." *Id.*  A change in the
23 law may support relief under Rule 60(b)(6) in a habeas action, and whether it does is decided
24 on a case-by-case basis.  *See Phelps v. Alameida*, 569 F.3d 1120, 1132-33 (9th Cir. 2009).

8

### 2. The Court Cannot Consider The Merits Of Claims Of Constitutional Violations

The habeas court must not allow a Rule 60(b) motion to be used to circumvent the rule in 28 U.S.C. § 2244(b) against second and successive habeas petitions.[2] *Jones v. Ryan*, 733 F.3d at 833. There is no bright line rule for determining whether a document labeled as a Rule 60(b) motion actually is a Rule 60(b) motion or is a disguised second or successive petition. *See Gonzalez v. Crosby*, 545 U.S. 524, 531-33 (2005); *Jones*, 733 F.3d at 834. These cases provide some guidance, however. "[A] legitimate Rule 60(b) motion attacks . . . some defect in the integrity of the federal habeas proceedings, while a second or successive habeas corpus petition is a filing that contains one or more claims, defined as asserted federal bas[e]s for relief from a state court's judgment of conviction. . . . Put another way, a motion that does not attack the integrity of the proceedings, but in effect asks for a second chance to have the merits determined favorably raises a claim that takes it outside the bounds of Rule 60(b) and within the scope of AEDPA's limitations on second or successive habeas corpus petitions." *Jones*, 733 F.3d at 834 (internal quotation marks omitted) (citing *Gonzalez*, 545 U.S. at 530, 532 n.5). Proper Rule 60(b) motions include those "assert[ing] that a previous ruling which precluded a merits determination was in error, for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar." *Gonzalez*, 545 U.S. at 532 n.4.

---

[2] A successive petition is a petition that raises grounds identical to those raised and rejected on the merits in a prior petition. *See Kuhlmann v. Wilson*, 477 U.S. 436, 444 n.6 (1986). A claim presented in a habeas petition that was presented in a prior habeas petition "shall be dismissed." 28 U.S.C. § 2244(b)(1). In contrast to the successive petition, a second petition (formerly considered as an abuse of the writ) is one that presents new claims after a petition raising other claims has been adjudicated on the merits. *See generally Kulman*, 477 U.S. at 444 n.6. A claim presented in a habeas petition that was not presented in a prior habeas petition must be dismissed unless "(I) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B). These rules apply when the first petition was dismissed as barred by the statute of limitations which constitutes a disposition on the merits. *See McNabb v. Yates*, 576 F.3d 1028, 1029 (9th Cir. 2009).

Giraldes' motion for reconsideration is partially a second or successive petition and partially a Rule 60(b) motion. It is a second or successive petition insofar as it seeks to argue the merits of new and existing claims for relief from the state court judgment and is a Rule 60(b) motion insofar as it seeks to have the order of dismissal set aside.

In his motion, Giraldes argues that this court should consider "whether it was ineffective assistance of appellate counsel for not seeking a 'stay' of the direct appeal" during the Grasso brothers' prosecution and "for instructing petitioner that this new evidence could not be brought until these others were convicted, and then finalized on appeal." Docket # 12 at 2; *see also id.* at 5-6. Giraldes also challenges the state court's rejection of his appeal. *See* Docket # 12 at 7-8. The new ineffective assistance of counsel claim and the repeated assertion of the other challenges to the state court's rejection of his appeal are in the nature of a second or successive petition, and therefore cannot be entertained by this court unless and until Giraldes obtains permission from the Ninth Circuit to file a second or successive petition.

The actual innocence argument discussed later in this order does not itself cause a second or successive petition problem because it is not a separate claim for relief. Rather, actual innocence has an important procedural effect, i.e., actual innocence provides a gateway for the court to consider an otherwise procedurally defective or untimely petition or claim. *Schlup v. Delo*, 513 U.S. 298, 316, 327 (1995). Here, one of the issues is whether there is evidence of actual innocence that would provide a gateway for consideration of the untimely petition.

3.    Rule 60 Relief Is Not Warranted

Giraldes argues that relief should be granted because he is actually innocent and the newish case of *McQuiggin v. Perkins*, 133 S. Ct. 1924 (2013), held that actual innocence permits consideration of an otherwise untimely habeas petition. This argument falters because the Rule 60 motion was not filed within a reasonable time and he has not shown actual innocence.

a.     The Rule 60(b) Motion Was Not Filed Within A Reasonable Time

Whatever date is used as the triggering date for Giraldes to file a Rule 60(b) motion, his motion filed in January 2014 was not filed within a "reasonable time," as required by Rule 60(c)(1). Giraldes has known since at least 1997 of the Grasso brothers' convictions for the homicides and perjury.[3] Giraldes argued in a habeas petition filed in Santa Clara County Superior Court on May 30, 1997, that their convictions showed his innocence. *See* Docket # 4 at Ex. 5. Back then, he claimed that their convictions after his appeal became final amounted to newly discovered evidence that went "to the heart of Giraldes' innocence." *Id.* at 13, 21.

Giraldes mentioned the Grasso brothers' convictions when this action was pending in 1998, but did not argue actual innocence back then.[4] Giraldes next asserted in this court in 2008 that the Grasso brothers' convictions were newly discovered evidence when he attempted to file a second or successive petition in this court, and asserted the same in 2009 when he unsuccessfully sought permission from the Ninth Circuit to file a second or successive petition in federal court.

The later developments in the Grasso brothers' case provided no materially different facts.

---

[3] The court will assume for present purposes that the Grasso brothers' convictions are the key facts that give life to Giraldes' actual innocence argument, even though Giraldes would have known of the Grasso brothers' roles in the killing and perjured statements at the time of his own trial.

[4] This court had no occasion to decide in 1998 whether actual innocence excused the untimeliness of the petition because Giraldes did not mention actual innocence in his petition for writ of habeas corpus (Docket # 1) or in his opposition (Docket # 5) to respondent's motion to dismiss. Giraldes *did* argue that he had to wait for the Grasso brothers' perjury convictions to become final before he could have argued to the state courts in state post-conviction proceedings that false evidence had been used against him. *See* Docket # 5 at 5, 10. This court rejected that argument in 1998 because "a claim for knowing use of perjured testimony does not depend on the finality of the perjurer's conviction" and Giraldes "apparently was aware that he did not need finalized convictions, because his first state habeas petition was filed well before he received the abstracts of judgments for the perjurers' convictions." *See* Docket # 7 at 4. Giraldes' false evidence claim did not assert, and was not the functional equivalent of, a claim of actual innocence and therefore gave the court no reason to consider whether he was actually innocent when it considered the timeliness of Giraldes' petition. Giraldes was not precluded by law from arguing actual innocence in 1998. In fact, the order of dismissal even noted that there could be equitable tolling of the limitations period "upon a showing of actual innocence that would result in manifest injustice." Docket # 7 at 3 (citing *Schlup v. Delo*, 513 U.S. 298, 329 (1995)).

1 The affirmance on appeal of their convictions and the denial of one brother's federal habeas
2 petition did not change the core of the evidence regarding the Grasso brothers' perjury and
3 participation in the killings. Giraldes suggests that he did not receive until March 19, 2014, a
4 copy of this court's April, 2000, order denying Rosario Grasso's habeas petition, but that order
5 did not provide any material information that was new to Giraldes, because he had been aware
6 of the convictions for well over a decade at that point. *See* Docket # 13 at 1-2.[5]

Giraldes also urges that his receipt of a December 2012 letter from the prosecutor has some significance, *see* Docket # 12 at 2 and Ex. C, but that letter does not provide any new information that he could not have learned by consulting the California Court of Appeal's 1995 opinion, i.e., that he was prosecuted on aiding and abetting and natural and probable consequences theories.   He also does not explain the one-year delay in presenting a Rule 60(b) motion based on this letter (and the letter's substance doesn't help him for the reasons explained in the next section).

Not only is there not a fact-based justification for his extreme delay, Giraldes cannot blame the state of the law for his delay in presenting his actual innocence argument. As noted earlier, Giraldes never argued actual innocence in 1998. Even if he had made the argument in 1998 and if this court had refused to consider actual innocence as providing a gateway to consideration of the otherwise untimely habeas petition, Giraldes could have appealed in 1998 any ruling by the district court regarding the effect actual innocence had on the statute of limitations calculation. *See Gonzalez v. Crosby*, 545 U.S. at 536-37. Although the Supreme Court's decision in *McQuiggin* in 2013 may have spurred Giraldes to make his current actual innocence argument, he was not precluded from arguing actual innocence before that decision. If Giraldes thought he needed to wait until controlling authority expressly authorized the actual innocence gateway for delayed petitions, that day came in August 2011, when the Ninth Circuit

---

[5]The petition in *Rosario Grasso v. Yearwood*, 2000 WL 502849, No. C 99-1407 SI (N. D. Cal. Apr. 17, 2000), had presented a single claim that Rosario Grasso's Confrontation Clause rights were violated by the admission of an insufficiently redacted copy of Michael Grasso's statement to police.

held that the actual innocence gateway did exist for otherwise time-barred petitions in *Lee v. Lampert*, 653 F.3d 929 (9th Cir. 2011) (en banc). Giraldes fails to explain why he waited 28 months after *Lee* to make his actual innocence argument. Moreover, Giraldes could have asserted his actual innocence argument at any time in 1998 and later – except for the six months that the panel decision in *Lee v. Lampert*, 610 F.3d 1125 (9th Cir. 2010), was on the books stating that actual innocence did not excuse an untimely federal habeas petition. *See Majoy v. Roe*, 296 F.3d 770, 776-77 (9th Cir. 2002) (noting that it was an open question); *see also Lee*, 610 F.3d at 1128 (whether actual innocence provided a gateway to consideration of untimely petition "is a question of first impression in our circuit"). The Rule 60(b) motion must be denied because it was not made within a reasonable time after the dismissal of the petition in 1998. The motion also must be denied because Giraldes has not shown actual innocence as explained in the next section.

### b. Giraldes Does Not Pass Through The Actual Innocence Gateway

A federal court may hear the merits of successive, abusive, procedurally defaulted, or untimely claims if the failure to hear the claims would constitute a miscarriage of justice. The Supreme Court limits the "miscarriage of justice" exception to habeas petitioners who can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (citing *Murray v. Carrier*, 477 U.S. at 496). Under this exception, a petitioner may establish a procedural "gateway" permitting review of defaulted claims if he demonstrates "actual innocence." *Schlup*, 513 U.S. at 316 & n.32. The actual innocence gateway established in *Schlup* is available to a petitioner whose petition is otherwise barred by AEDPA's statute of limitations. *See McQuiggin v. Perkins*, 133 S. Ct. 1924, 1928 (2013). "[I]f a petitioner . . . presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims." *Schlup*, 513 U.S. at 316. The required evidence

1 must create a colorable claim of actual innocence, that the petitioner is innocent of the charge
2 for which he is incarcerated, as opposed to legal innocence as a result of legal error. *Id.* at 321.

3        The California Court of Appeal's opinion indicates that Giraldes was found guilty based
4 on one of two theories, i.e., that the "killings were the natural and probable consequences of the
5 drug distribution conspiracy committed by co-members in furtherance thereof" and that he aided
6 and abetted the killings. *See* Cal. Ct. App. Opinion at 8-9 (listing Giraldes' claims of error);
7 *id.* at 10 (Giraldes and Shackelford join each other's arguments on appeal); 17-38 (discussing
8 both theories of liability). On appeal, the defendants challenged only the natural-and-probable-
9 consequences theory, and the California Court of Appeal rejected those challenges. The state
10 appellate court rejected, among other things, an argument that there had to be juror unanimity
11 on which of the two theories supported the verdict.

12        Giraldes appears to believe that the Grasso brothers' convictions of less serious homicide
13 offenses – i.e., involuntary manslaughter and second degree murder – demonstrate Giraldes'
14 actual innocence of first degree murder. California law provides otherwise. Under California
15 law, a defendant's liability on an aiding and abetting theory is not dependent on a principal being
16 convicted of the same or a greater offense. Although the "commission of a crime is a
17 prerequisite for criminal liability" under an aiding and abetting theory, *People v. Perez*, 35 Cal.
18 4th 1219, 1225 (Cal. 2005), an aider and abettor may be held liable for a greater offense than
19 another principal. "The fact that another principal is acquitted or convicted of a lesser offense
20 does not bar the conviction of the aider and abettor for the charged offense." *People v. Rose*, 56
21 Cal. App. 4th 990, 994 (Cal. Ct. App. 1997) (aider and abettor convicted of felony, while other
22 principal convicted of misdemeanor); *see e.g., People v. McCoy*, 25 Cal. 4th 1111, 1114 (Cal.
23 2001) ("[b]ecause defenses or extenuating circumstances may exist that are personal to the actual
24 perpetrator and do not apply to the aider and abettor," sometimes an aider and abettor may be
25 guilty of greater homicide-related offenses than the actual perpetrator); *People v. Summersville*,
26 34 Cal. App. 4th 1062 (Cal. Ct. App. 1995) (conviction for second degree murder under an aider
27 and abettor theory not improper even though principal was convicted of first degree murder).
28

14

That the Grasso brothers were convicted of perjury also does not automatically show Giraldes' actual innocence of murder.  The Grasso brothers had testified at the preliminary hearing and trial of Giraldes and Shackelford that "defendant [Giraldes], codefendant [Shackelford], and an unknown Hispanic male were the three shooters (RT 2472-2473; 2692)." Docket # 4 at Ex. 7 (Giraldes' attorney's declaration); *see also Grasso v. Yearwood*, 2000 WL 502849 (N. D. Cal. 2000) (Grasso brothers had testified "that they, as innocent bystanders, witnessed Giraldes, Shackelford, and an unidentified Hispanic man shoot the victims"). The statements that were the subject of the perjury counts in the March 7, 1994 indictment against the Grasso brothers concerned Shackelford and the Hispanic man but did not mention Giraldes. *See* footnote 1, supra. Thus, the existence of the perjury convictions does not inherently demonstrate Giraldes' innocence of murder.

The Grasso brothers' subsequent convictions also do not undermine the verdict against Giraldes because their credibility was already so damaged by the time of Giraldes' trial.  The Santa Clara County Superior Court in 1997 rejected Giraldes' habeas argument that his conviction "obtain[ed] with the use of perjured testimony" and the suppression of "evidence going directly to the credibility of the state's key witnesses" violated his right to due process. Docket No. 4, Ex. 6 (Santa Clara County Superior Court Order filed July 21, 1997) at 1.  "A careful review of the transcript of the [trial] testimony by this court reveals that the Grasso brothers' testimony was not believable and the prosecution effectively repudiated it.  It is thus apparent that the alleged 'newly discovered evidence' of the Grasso brothers' perjury convictions would only serve as cumulative impeachment of the Grassos' testimony and would not have resulted in a different outcome of the proceeding," *Id.* at 7.

Evidence that came from several different sources about Giraldes' pre-shooting conduct was not affected by the Grasso brothers' convictions and was suggestive of motive, intent and planning for first degree murder: Giraldes was a dealer in Chavez's drug ring; Giraldes had been giving his cocaine sales proceeds to victim Jouron to deliver to Chavez and then bypassed

1 Jouron when Jouron failed to deliver the money to Chavez[6]; Giraldes told drug ring leader
2 Chavez of the victims' betrayal and was present when Chavez expressed his desire to get the
3 victims before they got him; Giraldes told another person (i.e., Saghafian) "that the victims had
4 threatened him and that he wanted to get rid of them," and "that he would 'move up one step' in
5 the drug operation and would cut out the middle man," Cal. Ct. App. Opinion at 3-4; Giraldes
6 made several statements indicating his intent to poison one victim; and another person (i.e.,
7 Garcia) overheard Giraldes say on the telephone that "'we have to get rid of these guys for
8 [Chavez],'" *id.* at 5.   Giraldes participated in or was the moving force for the burglary that
9 yielded the guns used in the killings; and later, shortly before the killings, Giraldes and others
10 retrieved the guns from their storage place and put them in Giraldes' car.  The day before the
11 killings, Chavez told victim Jouron that he was going to the hills to test the guns and that the
12 Grasso brothers and Giraldes would be there.

13 Most significantly, there was evidence that Shackelford had told a third person that
14 Giraldes shot at the lap of one of the victims before one of the Grasso brothers shot and killed
15 the victims. Shackelford was present at the killings, and this statement is not undermined by the
16 convictions of the Grasso brothers.

17 There was evidence from several different sources about Giraldes' post-shooting conduct
18 that is not affected by the Grasso brothers' convictions:  Giraldes and Shackelford traveled to the
19 park together and left the park together after the victims were killed[7]; the day after the killing,
20 Giraldes, Shackelford and Rosario Grasso went to a residence where there where Giraldes told
21 several people they killed the victims because it was "'better them than us.'" *Id.* at 6.  Finally,
22 Giraldes had some incriminating evidence when arrested. *See* Docket # 4 at Ex. 6 (Santa Clara
23 County Superior Court order denying habeas petition) at 4-5.  He had a key to a storage locker
24 rented by Rosario Grasso in which guns were found.  Police also found an Uzi pistol in a

---

[6]*See* Docket # 4 at Ex. 5 (Giraldes' habeas petition filed in Santa Clara County Superior Court) at 7.

[7]*See* Docket # 4 at Ex. 5 at 7-8.

16

1  briefcase inside Giraldes' car; although the firing patterns didn't match those of the bullets that
2  killed the victims, the Uzi had an easily changeable barrel.  And the police found in Giraldes' car
3  17 hollow point silver tip bullets like the ones recovered from the bodies of the victims.

4  Giraldes has not presented evidence of innocence so strong that the court cannot have
5  confidence in the outcome of his trial.  His guilt and the Grasso brothers' guilt were not mutually
6  exclusive.  Giraldes has not shown that the Grasso brothers' testimony was key to his conviction
7  or that their testimony was not "effectively repudiated" as explained by the superior court.  As
8  the California Court of Appeal's description of the trial evidence shows, there was substantial
9  evidence from witnesses other than the Grasso brothers of Giraldes' involvement before, during,
10 and after the killings that would support his conviction under either the aider-and-abettor or the
11 natural-and-probable-consequences theory.

13 B.    Miscellaneous Matters

14 Giraldes has moved for appointment of counsel to represent him.  In light of the denial
15 of the Rule 60(b) motion, there is no likelihood of success on the merits in this action.  The
16 "interests of justice," 18 U.S.C. § 3006A(a)(2)(B), are not served by appointment of counsel in
17 a closed case.   The request for counsel is DENIED.  (Docket # 13.)

18 Giraldes has filed a request for clarification as to whether the order of dismissal was with
19 or without prejudice.  (Docket # 14.)  The request for clarification is construed to be a request
20 for information and is GRANTED in that the court now states that the order of dismissal was
21 with prejudice, meaning that Giraldes was not free to simply refile another petition for writ of
22 habeas corpus.  *See McNabb v. Yates*, 576 F.3d at 1030 ("dismissal of a first habeas petition for
23 untimeliness presents a 'permanent and incurable' bar to federal review of the underlying
24 claims").  Insofar as Giraldes suggests in the request that the court erroneously failed to provide
25 him information as to whether he "had a right to appeal, file objections, etc.," Docket # 14 at 2,
26 the court disagrees that it had any obligation to guide him on his options after the order of
27 dismissal was filed.  Further, Giraldes' suggestion that the court's order of dismissal has left him

in a state of confusion whether he may request permission from the Ninth Circuit to file a second or successive petition is not credible in light of the fact that he filed such a request in the Ninth Circuit in 2009.

A certificate of appealability will not issue. *See* 28 U.S.C. § 2253(c). This is not a case in which "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural [rulings]" in the order of dismissal or in this order. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The denial of the certificate of appealability is without prejudice to petitioner seeking a certificate from the United States Court of Appeals for the Ninth Circuit.

**CONCLUSION**

Petitioner's motion for reconsideration and motion to appoint counsel are DENIED. (Docket # 12 and # 13.) Petitioner's request for clarification of order of dismissal is construed to be a request for information and is GRANTED. (Docket # 14.)

IT IS SO ORDERED.

DATED: April 7, 2014

SUSAN ILLSTON
United States District Judge